AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
Jun 22 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

| United States of America | ) |
|---|---|
| v. | ) |
| JAZZ SVARDA, ERIC HILL | ) Case No. 3-20-MJ-70823 TSH |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **November 21, 2018** in the county of **San Francisco** in the **Northern** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S. Code § 1951 | Interference with commerce by threats or violence (Hobbs Act Robbery) |
| | Maximum Penalties:<br>20 years of imprisonment;<br>Fine that is the greater of $250,000, twice the gross pecuniary gain to the defendant, or twice the gross pecuniary loss inflicted on another;<br>3 years of supervised release; $100 mandatory special assessment |

This criminal complaint is based on these facts:

See attached affidavit of Anthony P. Guzman

☑ Continued on the attached sheet.

Approved as to form  /s Mari Overbeck
                     AUSA Mari Overbeck

/s/
*Complainant's signature*

Anthony P. Guzman, Special Agent DEA
*Printed name and title*

Sworn to before me by telephone.

Date: 06/22/2020

*Judge's signature*

City and state: San Francisco, California     Hon. Thomas S. Hixson, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
# AND ARREST WARRANTS

I, Anthony P. Guzman, a Special Agent of the Drug Enforcement Administration (DEA), currently assigned to the San Francisco Division, Oakland Resident Office, in California, being duly sworn, state:

## INTRODUCTION

1. I make this affidavit in support of an application under Rule 4 of the Federal Rules of Criminal Procedure for a criminal complaint and arrest warrants authorizing the arrest of Jazz SVARDA and Eric HILL, for committing a robbery affecting interstate commerce in violation of Title 18, United States Code, Section 1951, Hobbs Act Robbery, on or about November 21, 2018, in the Northern District of California.  Specifically, as set forth in detail below, SVARDA and HILL entered a Walgreens store at 901 Hyde Street in San Francisco, which is in the Northern District of California, wearing medical masks and hooded apparel to cover their faces, intending to rob the onsite pharmacy of prescription pills.  SVARDA and HILL followed through on their plan and used force and threats of force to rob the Walgreens of over 1,000 prescription pills, including oxycodone, hydrocodone, and morphine.

## SOURCES OF INFORMATION

2. This affidavit is submitted for the limited purpose of securing a criminal complaint and arrest warrants.  I have not included every fact known to me concerning this investigation.  Instead, I have set forth only the facts necessary to establish probable cause that violations of the federal laws identified above have occurred.

3. I have based my statements in this affidavit on my training and experience, personal knowledge of the facts and circumstances obtained through my participation in this investigation, information provided by other agents and law enforcement officers, information provided by reports of other law enforcement officers, information provided by video and photographic evidence, and information provided by records and databases.  I believe these sources to be reliable.  Where I refer to conversations and events, I often refer to them in

substance and in relevant part rather than in their entirety or verbatim, unless otherwise noted. This affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds. My experience and training as a DEA Special Agent and my participation in this investigation form the basis of the opinions and conclusions set forth below.

## AFFIANT BACKGROUND

4. I am a DEA Special Agent and I have held this position since November 2005. I currently am assigned to the Tactical Diversion Squad in the Oakland Resident Office of the San Francisco Division. Prior to attending the DEA Basic Agent Training Program and becoming a DEA agent, I was a sworn law enforcement officer with the El Paso Police Department for one year. As an El Paso police officer, I attended the El Paso Police Department Training Academy where I received several hundred hours of comprehensive, formalized instruction in the duties of a patrol officer and in municipal and state law. I have completed several courses offered by the California Narcotics Officers Association, including training on the abuse of pharmaceutical drugs.

5. Before becoming a DEA Special Agent, I attended and graduated from the DEA Basic Agent Training Program in Quantico, Virginia. At the DEA Basic Agent Training Program, I received several hundred hours of comprehensive, formalized instruction in the recognition, distribution, manufacturing, and packaging of controlled substances, as well as money laundering techniques, asset forfeiture, and the diversion of pharmaceutical drugs.

6. Over the course of my law enforcement career, I have participated in hundreds of investigations of illicit drug traffickers, including complex conspiracies. These investigations have involved the use of undercover officers, confidential informants, physical surveillance, and investigative interviews, which have led to the execution of search warrants and arrest warrants at both the state and federal level. I have participated in the execution of hundreds of warrants to search locations for controlled substances, related paraphernalia, firearms, and other evidence of violations of both state and federal narcotics statutes. I have participated in multiple wire

investigations at the state and federal level. I have been actively involved as the case investigator in state and federal investigations and have talked with multiple confidential informants involved in drug trafficking. I have been the affiant for both state and federal search warrants related to investigations of narcotics trafficking offenses. My work in these areas has resulted in arrests of numerous offenders at the state and federal level, and seizures of bulk narcotics, narcotics supplies, and assets.

7. As a DEA Special Agent with the Tactical Diversion Squad, one of my primary duties is to investigate the diversion of prescription medications from their intended route. These investigations can focus on a doctor, pharmacy, or a customer, and also often involve analysis of the Controlled Substance Utilization Review and Evaluation System (CURES), which is a prescription drug monitoring program run by the state of California.

8. Through my involvement in drug investigations, discussions with other law enforcement personnel, classroom and field training, discussions with confidential informants, and arrest interviews of defendants involved in the trafficking of controlled substances, I have become familiar with the methods used by drug traffickers to import, transport, safeguard, and distribute drugs, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

9. In the course of my investigative experience as a DEA Special Agent, I have developed experience in the use of confidential informants, wire and physical surveillance, telephone toll analysis, investigative interviews, and the service of search and arrest warrants. The investigations in which I have participated have included such issues as the possession with intent to distribute and distribution of controlled substances, the conducting of monetary transactions involving the proceeds of specified unlawful activities and use of monetary instruments to launder those proceeds, and conspiracies associated with criminal narcotics offenses. I have spoken to, and worked with, more experienced federal, state, and municipal agents and officers in connection with my work as a DEA Special Agent and El Paso police officer.

10. I have personally participated in the investigation discussed in this affidavit as the lead case agent, and I am familiar with the facts and circumstances of the investigation. My role in this investigation, combined with my training and experience, information I have learned from other DEA agents and other law enforcement agencies, including the San Francisco Police Department, and my review of records and reports relating to the investigation form the basis for the opinions I set forth in this affidavit. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another DEA agent, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part based on my preliminary review of the evidence.

## APPLICABLE STATUTES

11. Title 18, United States Code, Section 1951 provides whoever (1) knowingly obtains property from or in the presence of a victim; (2) by means of robbery; (3) while believing that the victim parted with the property because of the robbery; and (4) the robbery affected interstate commerce; shall be fined not more than $250,000 or imprisoned not more than 20 years, or both. "Robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his or her will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his or her person or property, or to property in his or her custody or possession, or to the person or property of a relative or member of his or her family or of anyone in his or her company at the time of the taking or obtaining.

## FACTS SUPPORTING PROBABLE CAUSE

### A. November 21, 2018 Walgreens Robbery

12. On November 21, 2018, at approximately 4:12 p.m., two men walked into the Walgreens located at 901 Hyde Street in San Francisco and used force and the threat of force to rob the Walgreens of over 1,000 prescription pills, including oxycodone, hydrocodone, and morphine.

13. The robbery was captured by surveillance cameras located inside of the Walgreens. However, because the robbers were wearing face masks and had the hoods of their outerwear on, it was not possible to identify the men based solely on the surveillance footage.

14. One of the robbers (later identified, as described below, as Jazz SVARDA and therefore referred to herein as "SVARDA" or "SUSPECT ONE") was wearing a light gray, hooded sweatshirt and had a black-and-white shirt tied around his waist. His shoes were grey in color and appeared to have a bright red or coral-coloring on their tongue. SVARDA also wore a surgical-type face mask.

15. The other robber (later identified, as described below, as Eric HILL and therefore referred to herein as "HILL" or "SUSPECT TWO"), was wearing a color-blocked dark blue-and-grey jacket. The shoes worn by HILL had a dark-colored band wrapped around the front of each shoe, and he wore a black cloth mask resembling a ski-mask to cover the lower part of his face.

16. Surveillance footage from inside the Walgreens shows the robbers idling for a few seconds around the register area, looking at the display items. According to the Walgreens employee who was standing at the register, SUSPECT TWO said "prescription." SUSPECT ONE then stepped over the door separating the register/pharmacy area from the sales floor, approached one of the two employees working in the pharmacy area, and stated, "Oxycodone, oxycodone." None of the employees saw a weapon, but they reported to police officers that SUSPECT ONE verbally threatened: "I have a gun – don't make me use it."

17. The surveillance footage shows SUSPECT ONE grabbing hold of one of the pharmacy technicians, who later told the police that SUSPECT ONE dragged him approximately 5-6 feet towards the time-controlled safes where certain pills were stored. The surveillance footage shows the pharmacy technician trying to grab one of the pharmacy shelves while being forcibly pushed by SUSPECT ONE in the direction of the safes. The pharmacist told police that she was able to get one of the time-controlled safes open and placed pill bottles in a white plastic bag held by SUSPECT ONE.

18. According to the employee who greeted the suspects when they entered the

5

pharmacy, while SUSPECT ONE was threatening the pharmacist and pharmacy technician and commanding them to open the safes where prescription pills such as oxycodone were stored, she attempted to escape through a side door. SUSPECT TWO yelled "where are you going," and grabbed hold of her with such force that it tore the buttons off of the vest of her work uniform.

19. Following the robbery, the surveillance footage shows the two suspects running out of the Walgreens. The surveillance video shows SUSPECT ONE carrying a white plastic bag that appears to be full.

20. The loss report prepared by Walgreens following the robbery detailed that more than 1,000 pills were stolen, worth more than $6,000.

### B. The Investigation Identifies a Grey Acura Used as a Getaway Vehicle by SVARDA and HILL

21. Law enforcement collected surveillance videos from a series of locations in the area surrounding the Walgreens. One video showed in the minutes after the robbery two individuals running towards a charcoal-grey Acura ("the Acura") parked just east of the Walgreens. After the suspects enter the vehicle, the video shows it traveling east on Bush Street.

22. Law enforcement reviewed surveillance footage and determined that the Acura had parked in the area around the Walgreens about 30 minutes before the robbery. Based on when the Acura parked in the area around the Walgreens, as well as the fact that two individuals could be seen running and getting into the Acura in the minutes after the robbery, investigators believed that the Acura was the car used by the robbers to travel to and from the Walgreens.

### D. SFPD Officers Track the Acura to a Ford and SUSPECT TWO/HILL

23. Based on a review of surveillance footage, law enforcement was able to track the approximate path of the Acura through the Tenderloin neighborhood of San Francisco in the aftermath of the robbery. Surveillance videos shows that the day of the robbery, at approximately 4:23 p.m., about 10 minutes after the Walgreens robbery concluded, the Acura entered a parking garage located at 135 Hyde Street and that approximately four minutes after the Acura entered the garage, two men exited the garage on foot. One of the men is wearing a

black-and-white shirt resembling the black-and-white shirt tied around SUSPECT ONE's waist and grey shoes resembling the grey shoes worn by SUSPECT ONE as seen in the Walgreens surveillance footage. The other man is wearing a blue puffy jacket and his shoes have a dark band around them resembling the shoes worn by SUSPECT TWO as seen in the Walgreens surveillance footage.

24. Surveillance video further shows that as the two men exited the garage they walked north on Hyde Street, then made a right turn and walked on Turk Street towards Leavenworth Street, and then made a left turn on to Leavenworth Street, walking on Leavenworth Street towards Eddy Street. Additional surveillance video footage shows the faces of the two suspects. One of the suspects, believed to be SUSPECT ONE/SVARDA, is depicted wearing a beige-and-brown baseball cap. Surveillance video footage shows the two suspects enter a silver Ford Focus ("the Ford") parked in the area of 246 Leavenworth Street. In the video, the suspects can be seen entering the Ford and the Ford can be seen driving away and making a left turn on to Eddy Street.

25. Surveillance video further shows that at approximately 8:59 a.m. the morning of the Walgreens robbery, the Ford parked in the area of 246 Leavenworth Street. Surveillance video shows that the individual driving the Ford exited the Ford and loitered in the area around Turk and Leavenworth Streets for approximately 20 minutes before he was picked up in the Acura. Per the surveillance video, the driver of the Ford was wearing a color-blocked dark blue-and-grey jacket resembling the one worn by SUSPECT TWO/HILL as seen in the Walgreens surveillance footage. The driver of the Ford also can be seen in the video wearing shoes with a dark band around them resembling the shoes worn by SUSPECT TWO/HILL as seen in the Walgreens surveillance footage.

26. Further, law enforcement utilized license plate readers to investigate the Ford. In the early afternoon on the day of the Walgreens robbery, an SFPD Tenderloin patrol vehicle license plate reader picked up the license plate of the Ford, which was parked on Leavenworth Street between Turk Street and Eddy Street (CA 6PZR653) and then determined that the Ford is

registered to D***** Hill at **** Silver Avenue in San Francisco, California.[1]

27.     Authorities conducted additional research regarding the Ford and learned that SFPD had contacted Eric HILL in the Ford during traffic stops on 7/20/18 and 07/02/16.

### C.     December 6, 2018 Crime Alert and Arrest of SVARDA

28.     On December 6, 2018, authorities sent out a crime alert regarding the robbery. The crime alert included a photo of the Acura taken from the surveillance footage. The alert described the suspected robbery vehicle as an "Acura TL, charcoal grey" with a moon roof and a "spare tire in the front driver side along with a white decal in the dash where the VIN would be, and a pink thing possibly tied to the windshield wipers."

29.     That same day, at approximately 6:30 p.m., SFPD officers located a grey, four-door Acura with a moon roof parked at the corner of Hyde Street and Golden Gate Avenue in the Tenderloin neighborhood of San Francisco. The car did not have a spare tire on the front driver side or a pink item tied to the windshield wipers, but it otherwise matched the description of the car in the crime alert.

30.     The officers approached the car and noticed an adult male sleeping in the front driver's seat. The man was later identified by his driver's license as Jazz SVARDA. The police saw a small bag containing a white powdery substance in plain view in the front driver's floorboard area of the car that they believed to be cocaine and/or cocaine base. The officers knocked on the car windows and awoke SVARDA, and asked him to unlock and open the car door. SVARDA refused. Despite multiple warnings, including warnings that the officers would break the window, SVARDA continued to refuse to open the door. Accordingly, the officers broke the window, unlocked the door, removed SVARDA, and placed him under arrest.

31.     The officers searched SVARDA and the car incident to his arrest. In the car, and on SVARDA's person, officers found multiple plastic baggies containing a variety of controlled

---

[1] Personal identifying information omitted.

substances, including cocaine base (approximately 23 grams net), cocaine powder (approximately 9.4 grams net), approximately 32 pills containing methamphetamine, approximately 30 oxycodone pills, and approximately 59 individually-packaged Suboxone strips.[2]  The officers later learned that the oxycodone pills found on SVARDA did not match the oxycodone pills stolen from the Walgreens pharmacy.  SVARDA also had in his possession U.S. currency in various pockets and of various denominations totalling approximately $630, as well as a digital scale.

### D. SFPD Officers Search the Acura and Find Clothing Matching SUSPECT ONE and SUSPECT TWO

32. Following SVARDA's arrest, SFPD officers towed and impounded the Acura. Upon searching the Acura, officers located the following items:

   a) A color-blocked dark blue-and-grey jacket resembling the one worn by SUSPECT TWO/HILL during the Walgreens robbery as seen in the Walgreens surveillance footage and as seen in the footage of HILL on the morning of the robbery at Turk and Leavenworth Streets after parking the silver Ford;

   b) A black cloth mask resembling a ski-mask, and also resembling the one worn by SUSPECT TWO/HILL during the Walgreens robbery as seen in the Walgreens surveillance footage;

   c) A light-grey hooded sweatshirt resembling the one worn by SUSPECT ONE/SVARDA during the Walgreens robbery as seen in the Walgreens surveillance footage;

   d) A brown-and-beige baseball cap resembling the one worn by one of the suspects after exiting the parking garage located at 135 Hyde Street on foot.

33. The color-blocked dark blue-and-grey jacket resembling the one worn by

---

[2] All of the drugs seized from SVARDA and the Acura were subsequently weighed and tested at a criminal laboratory.

SUSPECT TWO/HILL during the Walgreens robbery was submitted for DNA testing. The DNA results showed strong inclusive evidence of DNA belonging to both SVARDA and HILL.

34. Two cellular phones—one LG phone and one Samsung phone—also were found in SVARDA's car.

### E. SFPD Officers Obtain and Execute a Warrant on HILL's Residence

35. SFPD officers sought and obtained a warrant to search HILL's residence located at **** Silver Avenue in San Francisco, California. The SFPD officers executed the search warrant on or about December 18, 2018. During the search, officers located a blue puffy jacket resembling the one worn by one of the suspects exiting the parking garage located at 135 Hyde Street on foot. When asked if he knew SVARDA, HILL denied knowing SVARDA, and denied that he was involved in the robbery.

### F. HILL's Text Messages, Phone Calls and Internet Searches Tie Him to the Robbery

36. <u>Text Messages and Phone Calls from HILL's Phone.</u> Pursuant to a search warrant, authorities searched HILL's cellular telephone (seized during the search of his residence). Text messages on the cellular telephone showed that the phone was used to text SVARDA's cell phone on the day of the robbery. Specifically, there was a text message from SVARDA's cell phone to HILL's cell phone at approximately 8:50 a.m. on the morning of the day the Walgreens robbery asking, "You up?" There also is a call from HILL's cell phone to SVARDA's cell phone immediately after this text message is received that lasts for approximately 19 seconds. These communications take place shortly before the video footage shows HILL being picked up on the morning of the robbery in the Acura. Based on this text message and phone call, I have probable cause to believe that, contrary to his statement that he did not know SVARDA, HILL does in fact know SVARDA. Additionally, a text message sent on HILL's phone after the robbery exclaims to be in possession of "hella percocets." According to the theft and loss report from Walgreens, hundreds of pills were stolen from the Walgreens that were a combination of oxycodone and acetaminophen, which is the combination of drugs

that make up Percocet.

37. <u>Internet Searches from HILL's Phone.</u>  Pursuant to a search warrant, authorities reviewed internet searches associated with HILL's cellular telephone.  This information showed internet searches conducted on HILL's cellular phone on the evening of the robbery and two days later (on or about November 23, 2018) relating to pills and the characteristics and effects of certain pills.  Additionally, there was an internet search on HILL's phone for "Nucynta ER vs. Ocycontin" on December 17, 2018.  Nucynta ER pills were among those reported stolen by Walgreens.

G. **SFPD Obtains Cellular Location Data from SVARDA and HILL Showing They Were Together on the Day of the Robbery, Before and After the Robbery Took Place**

38. As part of the investigation into the robbery, SFPD officers also sought and obtained a search warrant from Google to obtain historical location data associated with SVARDA's and HILL's respective cell phones.  Based on my training and experience, conversations with other law enforcement personnel, and review of the Google location data from SVARDA's phone and HILL's phone, I believe that there is probable cause to believe that SVARDA and HILL were together for an extended period on November 21, 2018.  Specifically, the Google location data associated with SVARDA's phone and HILL's phone include location data showing that between approximately 9:20 a.m. (when HILL was picked up by the Acura on the morning of the robbery at Golden Gate Avenue and Leavenworth Street) until after the robbery, both generally are in the same locations the entire time.

39. The Google location data associated with SVARDA's phone and HILL's phone from the day of the robbery also aligns with the path of the Acura after the robbery (as described above in connection with law enforcement's analysis of surveillance camera footage) as it drove through the Tenderloin neighborhood of San Francisco before entering the parking garage at 135 Hyde Street.

40. The results of the Google search warrant also showed that on the day of the

robbery, after the robbery had occurred, one of the cellular devices found in SVARDA's car and seized by authorities as part of the investigation in this case was used to conduct a Google search of the names of pills that were stolen from the Walgreens. For example, on November 21, 2018 at approximately 4:47 p.m. (approximately 20 minutes after the robbery concluded), the device was used to search for "t 192 pill." According to the theft and loss report from Walgreens, T192 pills were among the pills stolen during the robbery. Similarly, at approximately 4:56 p.m., the device was used to conduct an internet search for "tapentadol," another type of pill stolen during the robbery according to the theft and loss report from Walgreens.

41. Walgreens Company's headquarters is at 200 Wilmont Road in Deerfield, Illinois. The company has locations across the United States and conducts interstate commercial transactions. Accordingly, there is probable cause to believe the above-described robbery affected interstate commerce.

42. Based on the account of the robbery by the Walgreens employees involved in it, as well as my review of the robbery as captured by the surveillance footage, I believe there is probable cause to believe the robbery was committed using the threat of force and, more specifically, the threat of a firearm. Each Walgreens employee who was present during the time of the robbery stated that he/she felt threatened by the subjects' actions, and feared for his/her personal safety.

## CONCLUSION

43. Based on the foregoing, my training and experience, and the training and experience of agents and investigators involved in this investigation, I believe there is probable cause to believe that HILL and SVARDA committed Hobbs Act Robbery in violation of Title 18, United States Code, Section 1951. Accordingly, I respectfully request a warrant to be issued for their arrest.

## REQUEST TO SEAL

44. The DEA's criminal investigation of HILL and SVARDA and others associated with the criminal conduct is ongoing. In addition, it is my belief that prematurely revealing the

specific details, facts, and reasons for the search, as detailed in this affidavit, may cause flight from prosecution, destruction of or tampering with evidence, intimidation of potential witnesses, and otherwise seriously jeopardize the investigation (e.g., prompting changes in behavior or notification of confederates).  Accordingly, I request that the Court issue an order that the criminal complaint, this affidavit in support of the criminal complaint and arrest warrants, the arrest warrants, and the attachments thereto, along with the order itself, be filed under seal until further order of the Court.

/s/
_____
Anthony P. Guzman
Special Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4 on this 22nd day of June 2020.  This complaint and warrants are to be filed under seal.

_____
HONORABLE THOMAS S. HIXSON
United States Magistrate Judge